

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed November 15, 2013

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ADKINS SUPPLY, INC. | § | Case No.  11-10353-RLJ-7 |
| | § | |
| Debtor. | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is the *Motion to Compromise Claim 45 of Horace T. Ardinger, Jr.* (the "Motion") [Docket No. 231], filed by Kent Ries, the chapter 7 trustee (the "Trustee") of the Adkins Supply, Inc. ("ASI") case. Though the Motion as titled refers to a compromise of the claim of Horace T. Ardinger, Jr. ("Ardinger")[1], it also references a counterclaim for usury and other unspecified actions that are likewise subject of the compromise. Badger Rotary Drilling,

---

[1] Horace T. Ardinger, Jr. passed away on December 24, 2012. "Ardinger" shall also mean Mary L. Ardinger as independent executrix of the estate of Horace T. Ardinger, Jr., deceased.

Page | 1

LLC d/b/a Badger Oilfiled Service and Supply ("Badger"), a large unsecured creditor in the case, filed its objection to the Motion.[2] Hearing was held on October 7, 2013.

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This memorandum opinion contains the Court's findings of fact and conclusions of law. *See* Fed. R. Bankr. P. 7052.

## I.

The settlement that the Trustee seeks approval of is a simple one: the Trustee will release all claims against Ardinger, and any claims against other Ardinger-related parties, in return for Ardinger's payment of $200,000 to the bankruptcy estate and withdrawal of the claim made by Ardinger in the ASI bankruptcy of $4.44 million (as reflected by Claim No. 45). The Trustee and Ardinger obviously support the settlement. Badger opposes the Court's approval of the settlement, contending, essentially, that the Trustee is not sufficiently informed concerning the Ardinger claim and the bankruptcy estate's potential counterclaims, and thus the settlement fails to account for the many issues that exist between ASI and Ardinger.

## II.

In assessing the merits of a settlement, a bankruptcy court must determine if the settlement is fair and equitable and in the best interest of the estate. *Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995) (citing *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)). The court must compare the terms of the settlement with the likely rewards of litigation. *Foster Mortg.*, 68 F.3d at 917. In making this evaluation, the courts in the Fifth Circuit employ a three-part test, considering the following: (1) the probability of success in the litigation, with due consideration for the uncertainty in fact and in law; (2) the complexity and

---

[2] The Internal Revenue Service ("IRS") also filed a limited objection [Docket No. 232] based on its contention that it holds a tax lien against any usury claim owned by the bankruptcy estate. The IRS does not oppose the terms of the compromise, provided its lien attaches to any proceeds realized by the estate from the compromise.

likely duration of the litigation and any attendant expense, inconvenience, and delay; and (3) all other factors bearing on the wisdom of the compromise. *Id.* Elaborating on "all other factors," the *Foster Mortg.* court listed several additional considerations adopted from prior opinions. Looking first at its opinion in *Matter of Texas Extrusion Corp.*, 844 F.2d 1142, 1159 (5th Cir. 1988), the court reiterated that "in the bankruptcy context, the interests of the creditors not the debtors are paramount." *Foster Mortg.*, 68 F.3d at 917 (quoting *Texas Extrusion*, 844 F.2d at 1159). The court clarified that even though the desires of the creditors are not binding, a court should carefully consider the wishes of the majority of the creditors. *Id.* Next, the court looked at the extent to which the settlement was truly the product of arms-length bargaining, and not of fraud or collusion. *Id.* The court in *Foster Mortg.* vacated the proposed settlement as the courts below had given no consideration to the issues it considered dispositive, namely that most all creditors in interest opposed the settlement and the settlement was reached between insiders without the participation of the creditors. *Id.*

In assessing the probability of success in the potential litigation that is subject of the compromise, the Court must first define the causes subject of the litigation. By the Motion, the Trustee, after identifying the Ardinger claim of $4.44 million, states he had "informally asserted a counterclaim and defense to the Ardinger claim on several grounds." Motion ¶ 2. As for defenses, the Motion states that ASI did not "receive the benefit of all the Ardinger funds advanced . . ."; that the alleged purpose of the "advances"—for purchase of inventory—is suspect as the advances bore no relation to actual inventory purchases; and, that, because of "Ardinger's involvement in this unusual financing arrangement"—a "circular flow of funding between ASI . . . and Ardinger"—Ardinger's claim should not be allowed. *Id.* ¶ 2a and 2c. The

Trustee then refers to a usury counterclaim resulting from the so-called financing because of the "'commission' or other profit" that Ardinger received in compensation for his advances.

At the hearing, the Trustee referred to potential *other* claims that the estate might hold against Ardinger. In addition to the usury claim, he stated that the estate may have civil "RICO" claims against Ardinger and potential "chapter 5 causes of action." The RICO claims obviously refer to the Racketeer Influenced and Corrupt Organizations Act; the chapter 5 causes of action refer to those set forth in chapter 5 of the Bankruptcy Code, fraudulent transfers (§ 548) and preference claims (§ 547). As was made apparent at the hearing, such causes of action would likewise be covered by the release flowing to Ardinger under the compromise. The Trustee was somewhat dismissive of these latter two causes of action, noting potential problems with any RICO claims because of the "enterprise" element. With respect to the chapter 5 causes of action, the Trustee assumes Ardinger's ability to offset his claim against any cause that the Trustee, on behalf of the bankruptcy estate, holds against Ardinger undermines any recovery.

As stated, the Trustee proposes to release the affirmative causes in return for a $200,000 payment and Ardinger's withdrawal of the $4.44 million claim. From what was described to the Court at the hearing, it is clear that the dealings between ASI and Ardinger were extensive. The Trustee and Badger agree that, at a minimum, ASI had paid $4.2 million in "commissions" to Ardinger. It was also noted that the commissions typically were 1% to 3% of the amount "advanced," and that such sum was only the commission part and did not include the "base" or principal amount. Accordingly, assuming an average of a 2% commission, the base or principal amount would have been approximately $210 million. The commissions were paid within a few days after the advances were made, thus raising the potential usury issues. Ardinger's claim amount, the $4.44 million, is supported by wire transfers which, apparently, were not repaid.

The Court assumes that the proposed settlement recognizes that Ardinger's $4.44 million claim is not tied to the $4.2 million agreed-upon commissions paid by ASI to Ardinger. In any event, Ardinger's release of its claim, assuming its validity, certainly benefits the estate to the extent it removes a large claim from the pot of claims that would share in any distribution from the estate.

The question, however, is whether Ardinger's withdrawal of its claim is meaningful. The proof of claim states the amount of the wire transfers of $4.44 million, has attached to it the documentary evidence of the wires; and then provides, by a listing of multiple legal theories, the bases that potentially support the claim. Among the asserted theories are common law fraud, breach of contract, Ponzi scheme, malicious prosecution, breach of fiduciary duty, and misappropriation of funds. Apart from evidence of the wire transfers, the proof of claim provides no underlying factual allegations to support the legal theories asserted.

The proof of claim was signed by Robert J. Widmer, as "Attorney in fact." The Court is advised that Mr. Widmer is an attorney at law. Counsel for Badger took the deposition of Mr. Widmer as a means to ascertain the nature and bases of the claim asserted by Ardinger against ASI. At every instance at which counsel questioned Mr. Widmer concerning the facts underlying *any* of the legal theories or the due diligence performed concerning the stated legal theories prior to filing the claim, Mr. Widmer himself, and with the assistance of two other attorneys present, ostensibly on his behalf, objected to the question followed by Widmer's refusal to answer the question.

### III.

#### A.

The following excerpts were taken from the July 30, 2013 oral deposition of Robert Widmer, Jr.:

> **Q.     Okay.  Let's talk, if we can, about the proof of claim.  And I'll hand Exhibit 2 back to you.**
>
> **If I could get you to look first at your signature block, and I believe that's on the second page of the exhibits.**
>
> **Is that, in fact, your signature that appears on the second page of Exhibit 2?**
>
> **A.     Yes.**
>
> **Q.     And then where it says, print name, Robert J. Widmer, Junior, that's you;**
>
> **correct?**
>
> **A.     Correct.**
>
> **Q.     And then it says, attorney-in-fact.**
>
> **Do you see where it says that?**
>
> **A.     Yes, I do.**
>
> **Q.     Did you have a written power of attorney from Mr. Ardinger when you signed this proof of claim?**
>
> **A.     No.**
>
> **Q.     On what basis did you sign the proof of claim referring to yourself as attorney-in-fact?**
>
> **A.     I signed it as his attorney, and I signed it as attorney-in-fact based upon how it was prepared by bankruptcy counsel.**

Dep. of Robert Widmer, Jr., 9:3–24, July 30, 2013, Doc. 293-3.

> **And you'll see a box that's numbered No. 1, amount of claim as of date case**

**filed.**

**Do you see that?**

A. Yes.

**Q. And then the dollar amount $4,440,000.**

**Do you see that?**

A. Yes.

**Q. Can you tell me how that dollar amount was calculated or what the basis of it was?**

A. It was calculated based upon the wire transfer documents that were appended to the proof of claim.

**Q. What did those -- well, if you can answer in a broad sense, what do these wire transfer confirmations -- what's the basis of those wire transfers, assuming they were made?**

A. It's funds that went to Adkins Supply from Horace T. Ardinger.

**Q. Why? Do you know why those funds went from Horace Ardinger to Adkins Supply?**

A. No.

**Q. Do you have any knowledge as to whether they were in the form of loans?**

MR. HENDERSON: Objection.

Instruct the witness not to answer to the extent the answer is based upon communications with Mr. Ardinger.

MR. WINDLE: And I'll join in that objection and

instruction.

        MR. HENDERSON: And instruct the witness not to answer.

 BY MR. COX:

 Q. Are you going to refuse to answer based on the advice of counsel?

 A. Yes.

*Id.* at 10:1–11:9.

 **Are you aware of any facts or the factual basis for referencing damages for Texas State Securities violations related to No. 1 and 2 above?**

 A. I believe that's privileged information because it's based upon discussions that I had with other counsel in the preparation of this proof of claim.

 **Q. So are you refusing to answer that question?**

 A. Yes.

*Id.* at 15:20–16:2.

 **Q. And this claim was filed on or about February 13 of 2012; is that correct?**

 A. That's correct.

 **Q. Okay. What due diligence have you done since February of 2012 to determine whether there was any factual basis under the assertion that there was statutory fraud?**

 A. I haven't done any.

 **Q. Are you aware of any other due diligence anyone else acting on**

**behalf of Mr. Ardinger has done to determine whether there was any factual basis for the assertion Item No. 4?**

MR. HENDERSON: Instruct the witness not to answer to the extent it involves attorney-client communications or work product privilege.

MR. WINDLE: I would join that. Any answer beyond yes or no, whether he's aware of anything, I'll join in that objection.

BY MR. COX:

**Q.    Are you going to answer whether you're aware of any due diligence that's been done, or are you going to refuse to answer the question?**

A.    I will refuse to answer the question.

**Q.    Okay. I'll tell you, as succinctly as I can, I have the same question really with respect to all of the other allegations. But let's stop at common law fraud.**

**Are you aware of any common law fraud committed by Adkins Supply?**

MR. HENDERSON: Same objection.

MR. WINDLE: I assert the same objection and instruct not to answer.

And that same instruction through brevity would apply if the same question were asked as to 6, 7, 8, 9, 10, 11, 12; all of the claims and causes of action through 17.

*Id.* at 16:16–17:25.

BY MR. COX:

Q. **So let's stop at my question with respect to Item 5, common law fraud. Are you aware of any facts that give rise to a claim of common law fraud committed by Adkins Supply?**

    MR. HENDERSON: Objection, asked and answered.

    Same instruction, based on privilege.

    MR. WINDLE: Join.

A. And I will not answer.

BY MR. COX:

Q. **Okay. Same question with respect to breach of contract?**

    MR. HENDERSON: Same objection; same instruction.

    When I say same objection or same privilege, I'm talking about attorney-client work privilege and also attorney-client communication privilege.

    MR. WINDLE: And I'll join in both

A. Same answer.

BY MR. COX:

Q. **Okay. The same question with respect to Item 7.**

**But before I get to that question, let me ask you, what is the Texas Theft Liability Act?**

A. I would need to refresh my memory with the statute.

Q. **Before you signed the proof of claim, did you do any research with respect to what's contained within the Texas Theft Liability Act?**

> MR. HENDERSON: Objection, work product privilege.
>
> Instruct the witness not to answer.
>
> MR. WINDLE: I'd join that objection and instruction;

same basis.

BY MR. COX:

Q. So will you refuse to answer that question?

A. Yes.

**Q. And then back to the original line of questioning, are you aware of any facts that support that allegation? Are you aware of anything that Adkins Supply did, or anyone acting on behalf of Adkins Supply did, that would violate the Texas Theft Liability Act?**

> MR. HENDERSON: Same.

*Id.* at 18:1–19:20.

**Q. Well, what was it about the claim against Adkins Supply that led you to include a reference to the possible operation of a Ponzi scheme?**

> MR. HENDERSON: Objection, work product privilege;

communication privilege; attorney-client communication privilege.

> Instruct the witness not to answer
>
> MR. WINDLE: And I'll join and instruct on the same

basis. And that's the same scenario communication with other counsel.

BY MR. COX:

**Q. So you refuse to answer?**

A. And I will not answer.

> **Q. Okay. Have you had any discussions with anyone other than counsel for Ardinger or counsel for the Ardinger estate, anyone outside the loop, so to speak, and also excluding Paula Acevedo, about the possible operation of a Ponzi scheme by Bob Adkins or any Bob Adkins related entity?**
>
> A. Not that I recall.
>
> **Q. Okay. Do you yourself have any reason to believe that Bob Adkins or Adkins Supply was operating as a Ponzi scheme?**
>
> MR. HENDERSON: Objection, calls for mental impressions of an attorney.

*Id.* at 21:21–22:20.

> **Q. All right. And I'll try to -- if I can, if you'll go back and look at the itemization, 1 all the way through 17, my understanding is that counsel has instructed you not to answer, based on various privileges.**
>
> **And in that context, are you aware of any factual bases for any of these theories or allegations in the itemization from any other source that would not involve or tread upon the attorney-client privilege or any of these other privileges that have been asserted today like from any outside sources that you could discuss with me today?**
>
> A. I'm -- I'm not aware of any.
>
> **Q. Okay. Are you aware of any individuals, any natural persons, who could answer such questions who are not barred from doing so by attorney work product or lawyer-client communication privileges?**
>
> MR. HENDERSON: Objection, calls for the mental

impressions of counsel, as well as the answer itself would reveal the discussions and the people involved in those communications.

MR. WINDLE: Unavoidably would do that. And it also requires the witness to speculate; although, it says, are you aware of anyone outside the privilege who might be able to provide that information.

I'll add that that's speculative as to this witness. And object and instruct not to answer on the basis of speculation too.

*Id.* at 23:16–24:18.

**Q.  And I want to wind back to the beginning with respect to the proof of claim.**

**Tell me the name of the persons -- of the natural persons who participated in the process, other than you, of preparing and filing the proof of claim.**

A.  Carol Wolfram, Craig Henderson, and Richard Mulkey.

**Q.  And who is Richard Mulkey?**

A.  He is a CPA.

**Q.  Okay. What was Mr. Mulkey's participation in the process? What information did he provide?**

MR. HENDERSON: Objection, work product privilege.

MR. WINDLE: Yeah, join and instruct not to answer, based on that.

A.  And I will not answer.

*Id.* at 26:19–27:9.

Q. **Okay. And I want to -- I'm still lost, and I apologize.**

**But what's the basis of the claim? I mean, in other words, the $4,440,000, was this money loaned by Mr. Ardinger to Adkins Supply?**

MR. HENDERSON: Objection, calls for a legal conclusion and also requires the witness to -- the answer may require communications between attorney and client and also work product privilege.

Instruct the witness not to answer.

BY MR. COX:

Q. **So you're not going to answer the question; is that right?**

A. Correct.

Q. **So you signed a proof of claim under penalty of perjury, but you're going to refuse to answer any questions about what provides the factual basis of that proof of claim; is that right?**

MR. HENDERSON: I'm going to instruct the witness not to answer because that's -- you're badgering the witness.

Instruct the witness not to answer.

BY MR. COX:

Q. **You signed the proof of claim under penalty of perjury; correct?**

MR. HENDERSON: Objection, the doc- -- the proof of claim speaks for itself, as well as the reference to the applicable statutory authority.

MR. WINDLE: Now, I'll join in that objection. And further -- further, to the extent that it might be a permissible question, it has been

answered. Asked and answered.

*Id.* at 41:17–42:23.

> **Q. Can you summarize what the factual basis for asserting a claim against that bankruptcy estate for over $4 million -- can you provide a third-grade summary of the basis for asserting that claim?**
>
> A. Yes.
>
> **Q. And that is what?**
>
> A. The third-grade summary are the attachments to the proof of claim. They show wire transfers that went out. We totaled them up. They total 4.44 million. That is the basis of this proof of claim.
>
> **Q. Okay.**

*Id.* at 42:25–43:10.

### B.

Though Mr. Widmer essentially refused to answer the questions from Badger's counsel, he was far more forthcoming in response to questions from the Trustee. The questions from the Trustee, however, were mostly self-serving, leading, and conclusory:

> **Q. It's my understanding that that claim, based on what you've testified here today -- and I'm just going to try and summarize -- you've got 11 or so pages of wire transfer documents from Bank of America and then another five pages from JPMorgan; is that right?**
>
> A. Yes.
>
> **Q. And so to generalize that, the claim is based on funds that were advanced by Mr. Ardinger to Adkins Supply; is that right?**

A. Yes.

Q. **You're not aware of any other reason why the claim would be based on something other than funds advanced? Like he sold widgets; he ran him over with a pickup truck and hurt his foot --**

A. No.

Q. **-- and had a personal injury claim or any other reason why?**

A. No. It is based upon the attachments to the proof of claim.

Q. **So, as far as you know, it's 100 percent based on funds, dollars that were advanced from one entity to the other entity?**

A. Yes, from one individual to the entity.

Q. **Okay.**

A. From Mr. Ardinger to the Adkins Supply.

Q. **Okay. Thank you.**

*Id.* at 33:21–34:21.

Q. **Okay. Who actually determined the amount that was due based on these wire transfers? Did you go through records and add all those up? Did someone else do that for you?**

A. Someone else did that.

Q. **And who did that?**

A. Several people were involved, so I don't know specifically which one person did it.

Q. **Okay. Do you know who those people would be?**

A. Carol Wolfram, Craig Henderson, and Richard Mulkey, and probably

    Paula Acevedo.

    **Q.    Okay. And who is she? How is she related to any of the people you mentioned?**

    A.    She works in the -- in the office of -- of Mr. Ardinger.

*Id.* at 37:14–38:3.

    **Q.    As far as you know, is she the one -- what was her last name?**

    A.    Acevedo.

    **Q.    Ms. Acevedo.**

    **Was she the one that would have provided the documentation, either directly or indirectly, to you?**

    **And, indirectly, I mean it could have gone to Ms. Wolfram or Mr. Henderson that went behind this proof of claim.**

    A.    In -- in all likelihood, yes.

*Id.* at 38:20–39:4.

## IV.

    To summarize from the foregoing, Mr. Widmer signed the Ardinger proof of claim specifically as attorney-in-fact though he stated at his deposition that he was acting as attorney at law. He then either effectively disavowed knowledge of any underlying facts regarding the claim or, with the aid of two other lawyers, refused to testify regarding *any* facts supporting the legal theories underlying the claim. Yet a third lawyer, Carol Wolfram, actually prepared the proof of claim for Widmer's signature and had it filed with the Court. It should be noted that this is a claim for over $4 million, filed with a federal court and signed under penalty of perjury. Ardinger, through his cadre of lawyers, obstructed Badger's basic inquiries regarding the nature

and validity of the $4.44 million claim. Badger is a co-creditor who is faced with the prospect of sharing *with Ardinger* in any dividend that might be paid out of this estate. Ardinger's claim would be disallowed if such tactics were used in response to a claim objection.

There are several problems with the proposed settlement. The Motion did not fully identify the potential causes of action subject of the settlement. At the hearing, the Trustee identified a possible RICO cause of action with the potential problem of proving an "enterprise," along with possible chapter 5 causes of action, presumably fraudulent transfers, that are potentially subject to offset by the claim made by Ardinger. The problem is that the Court is simply left with nothing more than speculating on possible factual scenarios that might support either the causes of action or the defenses to or weaknesses in the causes of action. For example, from the Trustee's questions of Widmer, it is obvious that the Trustee considers the wire transfers as loans made by Ardinger to ASI. Yet he also labels the return on such loans as "commissions." This makes no sense. How is a return on a loan a commission? While consideration of a settlement should not devolve into a mini trial, there was no attempt made to proffer even skeletal allegations of facts that might support the actions or defenses here. Finally, Badger's opposition to the settlement is telling. Badger is by far the largest creditor in the case whose interests align with that of other unsecured creditors.[3]

Given the amounts involved here, the Court can easily infer that any litigation would be lengthy, complicated, and expensive; it would certainly delay the completion of this bankruptcy case. These factors, which favor compromise, do not resolve the threshold issues, however.

A well-pleaded complaint and a well-pleaded answer and counterclaim would have

---

[3] Besides Ardinger's $4.44 million claim, R.L. Adkins Corp. ("RLAC") has filed its claim for $5.718 million. RLAC is a debtor in Case No. 11-10241-11 and is affiliated with ASI. RLAC agreed not to oppose any settlement in this case between the Trustee and Ardinger, pursuant to an agreement reached in connection with the confirmed chapter 11 plan in the RLAC case (Ardinger is a major creditor in the RLAC case, as well).

provided far more information for the Court's consideration than what has been presented here. The burden is on the settlement proponents to satisfy the Court that the settlement is fair and equitable and in the best interests of the estate. Badger, a major unsecured creditor, opposes the settlement upon the terms and circumstances proposed here. The Court agrees with Badger and concludes that approval of the settlement must be denied. It is, therefore,

ORDERED that the relief requested by the *Motion to Compromise Claim 45 of Horace T. Ardinger, Jr.* is denied.

### End of Memorandum Opinion and Order ###